UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS JAMES FICK,

Plaintiff,

Civil Action No. 18-13427
Honorable Arthur J. Tarnow
Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

Defendant.
______________________________/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 17]**

Plaintiff Thomas James Fick ("Fick") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #14, #17), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I. RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Fick is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment (**Doc. #17**) be **DENIED**, Fick's Motion for Summary Judgment (**Doc. #14**) be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to

sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

## II. REPORT

### A. Background

Fick was 38 years old at the time of his alleged onset date of August 30, 2013, and at 5'6" tall weighed approximately 200 pounds during the relevant time period. (Tr. 237, 241). He completed the tenth grade, taking special education classes, and eventually earned a GED. (Tr. 242). He worked as a delivery driver and then briefly as a bouncer before stopping work in June 2008 because the job was "seasonal." (Tr. 241-42, 310). He now alleges disability primarily as a result of coronary artery disease, peripheral artery disease in his right leg, posttraumatic stress disorder ("PTSD"), anxiety, and depression. (Tr. 241).

After Fick's application for SSI was denied at the initial level on December 22, 2015 (Tr. 156-59),[1] he timely requested an administrative hearing, which was held on September 12, 2017, before ALJ Christopher Mattia (Tr. 65-94). Fick, who was represented by attorney John Tsiros, testified at the hearing, as did vocational expert Susan Rowe. (*Id.*). On November 22, 2017, the ALJ issued a written decision finding that Fick is not disabled under the Act. (Tr. 33-50). On September 7, 2018, the Appeals Council denied review. (Tr. 1-6). Fick timely filed for judicial review of the final decision on November 1, 2018. (Doc. #1).

[1] Fick had filed a previous application for SSI. On August 30, 2013, ALJ Theodore Grippo issued a written decision finding that Fick was not disabled under the Act. (Tr. 98-116). On July 23, 2015, the Appeals Council denied review (Tr. 123-28), and Fick did not appeal this claim any further.

The Court has thoroughly reviewed the transcript in this matter, including Fick's medical record, function and disability reports, and testimony as to his conditions and resulting limitations. Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

**B. The ALJ's Application of the Disability Framework Analysis**

Under the Act, SSI is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Fick is not disabled under the Act. At Step One, the ALJ found that Fick has not engaged in substantial gainful activity since November 7, 2013 (the application date). (Tr. 35). At Step Two, the ALJ found that he has the severe impairments of coronary artery disease, status-post coronary artery bypass graft surgery; status post cerebral trauma; peripheral artery disease status post multiple endarterectomies of the right lower extremity; hypertension; obesity; ventral incisional hernia status-post repair; PTSD; generalized anxiety disorder; and persistent depressive disorder. (Tr. 36). At Step Three, the ALJ found that Fick's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 37).

The ALJ then assessed Fick's residual functional capacity ("RFC"), concluding that he can lift or carry 10 pounds frequently and 20 pounds occasionally; stand or walk for 4 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; push or pull

within the aforementioned weight restrictions, but only frequently with the upper extremities and only occasionally with the right lower extremity; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; never climb ladders, ropes, or scaffolds; occasionally reach overhead, and frequently reach in all other directions, with the bilateral upper extremities; frequently handle, finger, and feel with the bilateral upper extremities; never have exposure to extreme cold or extreme heat; occasionally have exposure to wetness, humidity, vibration, or atmospheric conditions such as dusts, noxious odors, fumes, or other respiratory irritants; occasionally have exposure to hazards such as unprotected heights or moving mechanical parts; frequently operate a motor vehicle; understand, carry out, and remember simple instructions; occasionally interact with supervisors and co-workers; never interact with the public; and perform work that does not require a production line pace, where co-workers' productivity is dependent on Fick's productivity. (Tr. 39-40).

At Step Four, the ALJ found that Fick has no past relevant work. (Tr. 48). At Step Five, the ALJ determined, based in part on testimony provided by the vocational expert in response to hypothetical questions, that Fick is capable of performing the jobs of inspector (40,000 jobs nationally), machine tender (45,000 jobs), and machine operator (30,000 jobs). (Tr. 49). Thus, the ALJ concluded that Fick is not disabled under the Act. (*Id.*).

**C. Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute

is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if

substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**D. Analysis**

In his motion, Fick argues that the ALJ erred in evaluating his mental impairments.[2] More specifically, Fick argues that the ALJ violated the treating physician rule when he failed to provide good reasons, supported by substantial evidence, for discounting the opinions of his treating psychiatrist, Ali Ibrahim, M.D., and treating therapist, Darneal McAllister, LMSW. (Doc. #14 at 23-29). According to Fick, the ALJ's error in this respect tainted both his Step Three conclusion that Fick's mental impairments do not meet or medically equal Listing 12.04, and his formulation of Fick's mental RFC. (*Id.* at 23-31). For the reasons set forth below, the Court finds merit to Fick's arguments.

From the record, it appears that Fick began treating with Dr. Ibrahim at Health Delivery, Inc. in March 2013, complaining of anxiety and sleep disturbances, and reporting that he was dealing with "multiple social stressors." (Tr. 531). His diagnosis was chronic depression, and he was prescribed a combination of trazodone, Vistaril, Paxil, Remeron, and Ativan. (Tr. 532-33). Over the course of 2013, 2014, and 2015, Fick continued to treat with Dr. Ibrahim, and he attended multiple therapy sessions with

[2] Fick also challenges the ALJ's evaluation of his physical impairments, arguing that his peripheral artery disease meets the criteria of Listing 4.12. (Doc. #14 at 19-23). Because the Court is recommending remand on other grounds, it need not pass on this alleged error. On remand, however, the ALJ should thoroughly evaluate Fick's physical impairments, particularly where the evidence establishes that, after the administrative hearing, Fick required a third surgery to address the recurrent atherosclerotic occlusion of the arteries in his right leg. (Tr. 13-17).

Mr. McAllister at Health Delivery. In May 2013, Fick reported increased anxiety and panic attacks, and a worsening mood, after he was assaulted. (Tr. 524). His medications were adjusted, and his diagnoses were modified to include PTSD and depression (major, recurrent, severe). (Tr. 525). At a September 2013 medication review, Dr. Ibrahim noted that Fick "remain[ed] fragile" with anxiety and irritability, and he encouraged Fick to continue with supportive psychotherapy. (Tr. 515).

At a therapy appointment in March 2014, Fick reported increasing anger and irritability, and Mr. McAllister observed that he was "very pressured and agitated." (Tr. 589). At his next visit, Fick reported continuing "problems controlling anxiety and anger." (Tr. 583). On April 28, 2014, Fick saw Dr. Ibrahim on an emergency basis, complaining of "more anxiety and anger," and his medications were increased. (Tr. 580). In June 2014, Dr. Ibrahim noted again that Fick remained "quite fragile." (Tr. 576). Subsequently, in November 2014, Mr. McAllister characterized Fick as "very angry" and "becoming hopeless." (Tr. 570). His anxiety, irritability, and frustration continued throughout early 2015, and his medications were increased. (Tr. 567 (anxiety "very high" in January 2015), 564 ("mad all the time" in February 2015), 560 (mood anxious, Paxil and Remeron doses increased on February 28, 2015), 557 (displayed "extreme anger towards his mother, swearing at her" during March 17, 2015 therapy session)).

On March 26, 2015, Fick presented to Mr. McAllister, indicating that he was "very frustrated" because he was "recently cut off from state disability." (Tr. 554). Concerned, Mr. McAllister apparently sent Fick to the emergency room at Covenant Healthcare for a mental health evaluation because he was having homicidal ideations. (Tr. 807-10).

According to emergency room records:

> [Fick] describes that he has been very stressed out lately due to trying to obtain and maintain disability status. He reports that he [h]as been "cut off" about every six months since being approved for disability and states that he "has had it." He reports that he spoke with his counselor today and expressed that he had homicidal thoughts and felt like "going down to the state and taking care" of those in charge of his disability benefit…. He reports that he has access to firearms, but then states that he gave away the keys to his gun safe as he knows "he's volatile" right now.

(Tr. 807). He was prescribed Xanax and encouraged to return if his symptoms worsened or persisted. (Tr. 810). At subsequent therapy appointments between March and June 2015, Mr. McAllister noted that Fick's anger and anxiety remained high, with obsessive thoughts about his state and federal disability cases. (Tr. 549 (a lot of problems with anger and anxiety, despite medication increases, on April 7, 2015), 545 (angry, irritable on April 27, 2015), 542 (irritable mood, angry outbursts, and apparent self-mutilation on May 1, 2015), 539 (difficulty "expressing his emotions without the use of anger and vulgar language" on May 21, 2015), 535 ("high anxiety" and "very difficult time controlling his anger" on June 9, 2015)).

On June 8, 2015, Dr. Ibrahim and Mr. McAllister prepared a Psychiatric/Psychological Examination Report for the State of Michigan. (Tr. 597-99). Their general observation was that Fick was angry, abrasive, and irritable most of the time. (Tr. 597). His hygiene was unkempt, his speech was tense and pressured, and his judgment was poor. (*Id.*). He had a history of emotional problems, including depression, mood swings, anxiety, flashbacks, and angry outbursts, as well as a history of abuse, and the providers opined that this had a "significant impact" on his ability to work. (*Id.*). His

mental status examination showed that he had frequent suicidal thoughts, but with no current plans; diminished mental capacity due to feeling overwhelmed; poor judgment; ongoing angry outbursts; and poor impulse control. (Tr. 598). When asked to comment on Fick's ability to function independently on a daily basis, Dr. Ibrahim and Mr. McAllister opined:

> Mr. Fick cannot hold a job with his mental conditions. Mr. Fick has extreme mood/anger problems. Depression/anxiety daily. Feelings of hopelessness. Severe degree of difficulty getting along with other people including family. Does not attend social functions & has poor interest in any activities.

(*Id.*). Fick's diagnoses were PTSD, major depression (severe), generalized anxiety disorder with panic attacks, and bipolar disorder (not otherwise specified). (*Id.*).

In a Mental RFC Assessment completed at the same time, Dr. Ibrahim and Mr. McAllister opined that Fick was markedly limited in the following abilities: understand and remember detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions. (Tr. 595-96).

Fick now argues that the ALJ violated the treating physician rule when he

discounted the June 2015 opinions of Dr. Ibrahim and Mr. McAllister. (Doc. #14 at 23-29). The treating physician rule "mandate[s] that the ALJ 'will' give a treating source's opinion controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(c)(2)). "If the ALJ declines to give a treating source's opinion controlling weight, [the ALJ] must then balance the following factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see, e.g.*, *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Even when inconsistent with other evidence, a treating source's medical opinions remain entitled to deference and must be weighed using the factors provided in 20 C.F.R. §§ 404.1527 and 416.927."). "Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given to a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (quoting 20 C.F.R. § 404.1527(c)(2)). Those reasons "must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Id.* (quoting *Soc. Sec. Rul. 96-2p*, 1996 WL 374188, at *5 (July 2, 1996)).

In this case, the ALJ specifically considered the Psychiatric/Psychological Examination Report and Mental RFC Assessment completed by Dr. Ibrahim and Mr. McAllister in June 2015, stating as follows:

> [T]he extreme limitations assessed are not consistent with the record as a whole, including Dr. Ibrahim's mental status examination findings, those of the claimant's other providers, the claimant's limited and conservative course of treatment and his activities as discussed in detail above. For the foregoing reasons, and to the extent this opinion is consistent with the mental limitations assessed in the residual functional capacity above, I give it partial weight.[3]

(Tr. 46 (footnote added)). Fick now argues that the reasons articulated by the ALJ for discounting the opinions of Dr. Ibrahim and Mr. McAllister are not supported by substantial evidence.

To begin with, Fick takes issue with the ALJ's decision to discount Dr. Ibrahim's opinion as purportedly inconsistent with his "limited and conservative course of treatment." (Doc. #14 at 27 (quoting Tr. 46)). Specifically, Fick argues that he treated with Dr. Ibrahim for years, taking a combination of "five potent psychotherapeutic medications" for his depression, anxiety, insomnia, and PTSD. (*Id.* at 27). According to Fick, the dosages of these medications were increased on several occasions, and still were only "partially effective in moderating the symptoms of his mental illness[.]" (*Id.* at 28). Indeed, Fick's mental health providers routinely characterized his progress as "minimal," "limited," or "poor" (Tr. 529, 536, 540, 543, 550, 555, 571, 590, 601), which certainly

[3] The ALJ also noted that the statement of Dr. Ibrahim and Mr. McAllister that Fick is "unable to work due to his mental health conditions" is not a medical opinion, but, rather is an administrative finding on an issue reserved to the Commissioner. (Tr. 46 (citing 20 C.F.R. § 416.920b(c)(3)). Fick does not challenge this aspect of the ALJ's analysis. But, even setting aside this specific statement, there are other aspects of the treating providers' opinions that the ALJ was required to consider and weigh pursuant to the applicable regulations.

suggests that his medications were not entirely effective in controlling his symptoms. Moreover, in March 2015, even after Fick had been taking medication for years, he was so unstable that he was sent to the emergency room for a mental health evaluation. (Tr. 807-10). Here, then, where the ALJ failed to explain how Fick's lengthy history of counseling and prescription psychotropic medication – coupled with at least one emergency room visit – qualifies only as "limited" or "conservative" treatment, this is not a satisfactory basis for rejecting a treating physician opinion. *See, e.g., Odisian v. Colvin*, No. CV 12-9521-SP, 2013 WL 5272996, at *8 (C.D. Cal. Sept. 18, 2013) (finding treatment with psychiatric medications and sessions with a psychologist not necessarily conservative treatment).

The ALJ's decision to discount Dr. Ibrahim and Mr. McAllister's opinions as inconsistent with their own "mental status examination findings" also is not supported by substantial evidence. (Tr. 46). Although the ALJ does not identify these purported inconsistencies in detail, the Commissioner attempts to bolster the ALJ's analysis by arguing that "the mental status findings cited by Dr. Ibrahim in his June 2016 assessment – on which his mental limitations are presumably based – are not consistent with his own treatment notes." (Doc. #17 at 21). Specifically, the Commissioner takes issue with Dr. Ibrahim's observation that Fick had "frequent suicidal thoughts," asserting that "his treatment notes show that Plaintiff consistently denied suicidal thoughts." (*Id.*). But, while this is true on some occasions, there are plenty of instances in the Health Delivery records that are consistent with Dr. Ibrahim's and Mr. McAllister's observations in this respect. (*E.g.*, Tr. 570 (reporting "becoming hopeless" in November 2014), 552 (sent to

the emergency room with "high anxiety" in March 2015), 549 (engaging in apparent self-mutilation in April 2015), 549 (same in May 2015), 538 (reporting thoughts that he would be "better off dead" or of hurting himself "[m]ore than half the days" in June 2015), 600 ("struggle to keep self going day to day" and "not having much reason to live" in July 2015)). While the ultimate factual determination on this issue is the ALJ's to make, his decision must be the product of a fair weighing of the competing evidence – something that is not reflected in the written decision from which Fick appeals.

Similarly, the Commissioner challenges Dr. Ibrahim's finding of "poor judgment," arguing that "his treatment notes reflect only fair-to-good and good judgment." (Doc. #17 at 21). This too is incorrect, as Dr. Ibrahim and Mr. McAllister's finding of poor judgment finds ample support in their treatment notes, where they consistently noted that Fick's judgment was "impaired." (*E.g.*, Tr. 540, 548, 565, 571, 574, 584, 590). And, the providers' findings that Fick had "ongoing angry outbursts" and "poor impulse control" (Tr. 598) are also consistent with their treatment notes. (*E.g.*, Tr. 583 ("problems controlling anxiety and anger" in April 2014), 570 ("very angry" in November 2014), 564 (Fick's mother reported that he was "mad all the time and he yells and swears at her" in February 2015), 557 (displayed extreme anger in March 2015 therapy session), 549 ("problems with anger and anxiety" in April 2015), 545 ("mood and affect are angry" in April 2015), 542 ("angry outbursts" and mood swings in May 2015), 539 ("difficult time expressing his emotions without the use of anger and vulgar language" in May 2015), 535 ("very difficult time controlling his anger" in June 2015)). Again, the ALJ's decision should demonstrate that this evidence was considered and weighed against the other

evidence on which the ALJ relied to support his decision.

For all of these reasons, the ALJ's decision to discount the opinion of Fick's treating mental health providers as inconsistent with their own "mental status examination findings" (Tr. 46) is not supported by substantial evidence.[4]

Additionally, the ALJ discounted the opinions of Dr. Ibrahim and Mr. McAllister – namely, that Fick had marked limitations in numerous functional areas – as inconsistent with Fick's "activities as discussed in detail above." (Tr. 46). Elsewhere in the ALJ's decision, he characterized Fick as performing a "variety of activities," including:

> He is able to drive a car, ride in a car, shop in stores and at the gas station, manage personal finances, and does not need someone to accompany him places. (Testimony; [Tr. 261-62, 275, 918, 920]). He is also able to watch television and use a computer, mow a lawn with a riding mower with breaks, perform simple household chores such as washing dishes, and go hunting 1-2 days per year, spend time with friends, go to the bar and play pool occasionally. (Testimony; [Tr. 583, 589, 919]).

(Tr. 45). But, a review of the very records cited by the ALJ in support of this characterization paints a different picture. For example, although the ALJ credited Fick

---

[4] The ALJ also discounted the opinions of Dr. Ibrahim and Mr. McAllister, in part, because they were "not consistent" with the mental status examination findings of Fick's "other providers." (Tr. 46). Fick correctly points out, however, that the providers who described him as having no depression, anxiety, or agitation were not mental health professionals but, rather, were almost always evaluating his physical impairments. (*E.g.*, Tr. 703 (primary care physician noted no anxiety, depression, or agitation at October 2013 physical examination), 843 (emergency room notation of "normal mood and affect" when he presented in August 2015 for a post-surgical wound check), 945 ("normal mood and affect" when he presented with chest pain in June 2017)). On remand, the ALJ should specifically consider this issue, including the extent to which the mental status findings of Fick's psychiatrist and therapist, both of whom treated him over a period of years, should be afforded more weight than the observations of non-mental health professionals who were principally evaluating Fick's physical impairments. *See, e.g., Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011) ("Moreover, when the physician is a specialist with respect to the medical condition at issue, … her opinion is given more weight than that of a non-specialist.").

for being able to "drive a car" and "shop in stores," he and his mother elsewhere indicated that his 78-year-old grandmother shops for him, and his "P.T.S.D. makes [him] angry so [he] get[s] road rage" and does not drive. (Tr. 261, 262, 275). Similarly, the record cited by the ALJ in support of his conclusion that Fick "spend[s] time with friends" is actually Fick's report to Mr. McAllister that his anger had been out of control lately, and he was "upset with a good friend for not paying him[.]" (Tr. 583). And, the ALJ's observation that Fick can "go to the bar and play pool occasionally" (Tr. 45) is supported, in part, by a citation to a record where Fick reported anger and irritability to his therapist, saying he "punched his cousin in the bar." (Tr. 589). The Court also notes Fick's testimony, unaddressed by the ALJ, that he spends 10-12 hours a day in his room "to avoid most people because [he doesn't] want to get into a confrontation with people." (Tr. 75). In short, the ALJ's analysis of Fick's daily activities is not supported by substantial evidence. *See Trudell ex rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) ("'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'") (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

Given these facts, the Court simply cannot find that substantial evidence supports the ALJ's decision to discount the opinions of Fick's treating mental health providers as inconsistent with their own treatment notes, Fick's daily activities, and his alleged "limited and conservative" course of treatment. (Tr. 46). Because the ALJ's error in

weighing these opinions taints both the mental RFC finding and the Step Three conclusion that Fick does not meet or medically equal Listing 12.04 and/or 12.06, remand is required.

## III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment (**Doc. #17**) be **DENIED**, Fick's Motion for Summary Judgment (**Doc. #14**) be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

Dated: September 17, 2019
Ann Arbor, Michigan

s/David R. Grand
DAVID R. GRAND
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate

review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 17, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager